HARBOR MEDICAL CORPORATION, ET AL; [1] Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent Harbor Medical Corp. v. Commissioner
Docket Nos. 3674-77, 3675-77, 3676-77.
United States Tax Court
T.C. Memo 1979-291; 1979 Tax Ct. Memo LEXIS 234; 38 T.C.M. (CCH) 1144; T.C.M. (RIA) 79291; August 1, 1979, Filed Robert H. Weir, for the petitioners. Jerome Borison, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in petitioners' income tax as follows: Taxpayer
Year Ended
Amount
Harbor Medical
Corporation
June 30, 1974 $ 2,589.00
Harbor Medical
Corporation
June 30, 1975
4,836.00
John and Elizabeth
Blanton
December 31, 1974
2,116.00
Joseph and Lavonne
Anzalone
December 31, 1974
522.00
*235 The issues presented are: 1. Whether the expenses of owning and operating an airplane were ordinary and necessary business expenses of Harbor Medical Corporation. 2. If so, whether the requirements of section 274 have been met where applicable. 3. Whether Harbor Medical Corporation is entitled to an investment credit with respect to the airplane. 4. Whether petitioners Anzalone and Blanton received constructive dividends from Harbor Medical Corporation equal to the fair rental value of the corporation's airplane used by them for personal purposes. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. At the time it filed its petition, Harbor Medical Corporation ("Corporation"), a California corporation, had its principal place of business in Santa Cruz, California. It maintained its books and records on a fiscal year ending June 30. Its stock was owned 50 percent by Joseph Anzalone and 50 percent by John Blanton. John and Elizabeth Blanton and Joseph and Lavonne Anzalone resided in Santa Cruz, California, at the time they filed their petitions. John Blanton and Joseph Anzalone are licensed physicians specializing *236 in obstetrics and gynecology. They were associated in the practice of medicine and employed by Corporation during the periods in issue. In the latter part of 1973 Corporation purchased a five-passenger Beech Bonanza airplane. This airplane is sophisticated, well equipped and fast, and cost $76,143. Corporation put the airplane into service during fiscal 1974, and on its fiscal 1974 return claimed a tentative investment credit of $5,536, of which $5,330 was attributable to the airplane. Because of limitations, only $24 of this credit was actually used in fiscal 1974 and the balance was carried forward. Dr. Anzalone obtained his private pilot's license in 1973. He also holds the following additional licenses and ratings: commercial, instrument, multi-engine, flight instructor and instrument flight instructor. Dr. Blanton was a flight surgeon in the Navy in 1963, at which time he got his flight training and received his pilot's license. He holds a private pilot's license and an instrument rating.
Prior to Corporation's purchase of the Bonanza, Drs. Anzalone and Blanton and a third individual had purchased, and they continued to own and fly, a Cherokee airplane for personal *237 pleasure. At a special meeting of the Board of Directors of Corporation on March 8, 1974, it was resolved that Drs. Anzalone and Blanton would reimburse Corporation at the rate of $25 an hour for personal use of the Bonanza. The rate of $25 per hour was the rate at which the doctors could have rented a similar Bonanza from a third party at arm's length. The company insuring Corporation's Bonanza required that to obtain coverage the doctors would each first have to fly the airplane with an instructor for 25 hours. In addition, the Federal Aviation Administration ("FAA") requires that to carry passengers a pilot must have made three take-offs and landings within the 90 days preceding flying with a passenger. Moreover, to keep an instrument rating current and in force, the FAA requires that a pilot holding such a rating must have logged six hours in actual or simulated instrument conditions within the prior six months. Corporation's Bonanza was one of the first such airplanes to be equipped with a Collins automatic pilot. The FAA required that the automatic pilot be certified. Corporation had continuous problems getting the automatic pilot certified and was constantly flying *238 the airplane to Tower Avionics in Oakland to have it checked and repaired. The airplane finally had to be sent to Cedar Rapids, Iowa, to have the automatic pilot repaired. Because of the difficulties with the automatic pilot the airplane was unavailable for use for considerable periods of time during the years in issue. Corporation had no patients outside the Santa Cruz area and the airplane was not used by the doctors in their day-to-day practice of medicine. The airplane was flown 78.9 hours for pilot instruction, maintenance and repair (including delivery of the airplane) during fiscal 1974 and 43.62 hours for such purposes during fiscal 1975. Corporation kept the airplane at an airport in Watsonville, California. On June 30, 1974, Dr. and Mrs. Blanton and Mr. and Mrs. Peter Thomas (Mr. Thomas is Corporation's certified public accountant ("CPA")) flew to Napa for dinner. While at dinner and/or on route Dr. Blanton and Mr. Thomas discussed Corporation's pension and profit sharing plans. During fiscal 1974 the doctors also entertained two airline pilots (whose wives were patients) and another doctor, using the airplane as follows: Date
Guest
Pilot
Itinerary[2]
1/25/74
Glen Pound
Dr. Blanton
Watsonville, Reno (Nevada),
Tahoe, Watsonville
1/27/74
John Pollard
Dr. Blanton
Watsonville, Nut Tree
and wife
Restaurant, Watsonville
2/15/74
Glen Pound
Dr. Blanton
Watsonville, Yuma (Arizona)
and wife
2/17/74
Glen Pound
Dr. Blanton
Yuma (Arizona), Death
and wife
Valley, Las Vegas (Nevada)
2/18/74
Glen Pound
Dr. Blanton
Las Vegas (Nevada), Watsonville
and wife
3/9/74
Dr. Miller
Dr. Anzalone
Watsonville, Tahoe,
Watsonville (ski trip)
*239 Glen Pound and John Pollard are airline pilots. Both they and their wives have on occasion referred patients to Corporation. Dr. Miller is a physician who has referred patients to Corporation. These trips were claimed as business trips by Corporation. During fiscal 1975 the doctors made the following alleged business trips in Corporation's airplane: Date
Guest
Pilot
Itinerary
8/15/74
Dr. Yurich
Dr. Blanton
Watsonville, Tahoe,
and wife
Sun Valley (Idaho)
8/17/74
Dr. Yurich
Dr. Blanton
Sun Valley (Idaho),
and wife
Watsonville
8/26/74
Dr. Lasher
Dr. Anzalone
Watsonville, Columbia,
Watsonville
9/3/74
Dr. Miller
Dr. Anzalone
Watsonville, Napa,
and wife
Watsonville
9/5/74
Mr. Dunn
Dr. Blanton
Watsonville, Napa,
and wife
Watsonville
9/8/74
Dr. Persons
Dr. Anzalone
Watsonville, Tahoe,
Watsonville
10/5/74
Dr. Anzalone
Watsonville, Tahoe,
Watsonville
12/1/74
Mr. Dunn
Dr. Blanton
Watsonville, Napa,
and wife
Watsonville
1/30/75
Dr. Blanton
Watsonville, Death
Valley, Watsonville
3/29/75
Dr. Blanton
Las Vegas (Nevada),
Los Angeles
4/6/75
Dr. Blanton
Los Angeles, Watsonville
5/2/75
Mr. Canfield
Dr. Anzalone
Watsonville, Livermore,
Mr. Alderson
Santa Paula, Watsonville
6/20/75
Mr. Thomas
Dr. Blanton
Watsonville, Sun River
and wife
(Oregon)
6/22/75
Mr. Thomas
Dr. Blanton
Sun River (Oregon),
and wife
Watsonville
*240 Dr. Yurich is a physician who has referred patients to Corporation. Dr. Yurich and his wife and Dr. Blanton and his wife hiked, fished and played tennis while at Sun Valley in August 1974. Dr. Lasher has also referred patients to Corporation. Columbia, California, is a rebuilt ghost town in the foothills of the Sierra Nevada Mountains. As previously noted, Dr. Miller is a physician who has referred patients to Corporation. All trips to Napa were for the purpose of having dinner there. Mr. Dunn is one of Corporation's lawyers and while at dinner and/or on route to Napa, Dr. Blanton and Mr. Dunn discussed Corporation's problems regarding malpractice insurance (September 5 and December 1, 1974). Dr. Persons is a physician (and also a pilot) who has referred patients to Corporation. Dr. Anzalone's trip to Tahoe on October 5, 1974, was for the purpose of looking over condominiums as a possible investment for Corporation. Dr. Blanton's trip to Death Valley on January 30, 1975, was to attend a Flying Physicians Meeting. Dr. Blanton's trip to Los Angeles (March 29 to April 6) was to attend a gynecological meeting. Dr. Anzalone's trip to Santa Paula on May 2, 1975, was to look *241 at an investment he, Dr. Blanton and his guest had in oil property in the area. Dr. Blanton's trip to Sun River, Oregon, with CPA Thomas (June 20 to 22, 1975) was to look at condominiums as a possible investment for Corporation. Corporation has not purchased any condominiums at Tahoe or Sun River or any other place. In addition to the trips previously described, the doctors used the plane for acknowledged personal trips (for which they have reimbursed Corporation at the rate of $25 per hour) seven hours in fiscal 1974 and 20.32 hours in fiscal 1975. The primary source of patients for Corporation's medical business comes from referrals, about half of which are from other physicians and about half of which are from patients. Very few patients just walk in or come from looking up the doctors in the telephone book. The pilots (and their wives) and the physicians entertained by Drs. Anzalone and Blanton on the airplane represent a small fraction of total persons referring patients to Corporation and their referrals represent a small percentage of total referrals to Corporation. Corporation deducted the expenses of owning and operating the airplane in the amounts of $12,270 for *242 fiscal 1974 and $17,312 for fiscal 1975. Respondent disallowed the entire amount and the associated investment credit. In addition, respondent determined that Drs. Anzalone and Blanton had constructive dividends equal to the fair rental value of the airplane used by them for what respondent determined were personal purposes. OPINION The first issue presented in this case is whether the expense of owning and operating a Beech Bonanza during fiscal 1974 and 1975 was deductible as an ordinary and necessary business expense. Section 162. [3]Harbor Medical Corporation ("Corporation") has the burden of showing that the operation of the airplane during the years in issue was "necessary" to its medical practice in the sense that it was "appropriate and helpful," and that it was "ordinary" in the sense that it was a "normal and natural response under the specific circumstances" in which Corporation found itself. Welch v. Helvering,290 U.S. 111 (1933); Graham v. Commissioner,35 T.C. 273, 278-79 (1960). Also inherent in the concept of ordinary and necessary *243 expenses incurred in the operation of a trade or business is the requirement that the expenditure be "reasonable" in amount in relation to its purpose. United States v. Haskel Engineering & Supply Co.,380 F. 2d 786, 788 (9th Cir. 1967); Commissioner v. Lincoln Electric Co.,176 F. 2d 815, 817-18 (6th Cir. 1949), cert. denied 338 U.S. 949 (1950). On these particular facts, we are unable to find that Corporation has met its burden of proving that the purchase and operation of the airplane by Corporation was a "necessary" business expense. It was not demonstrated to be "appropriate" to Corporation's medical practice to own a sophisticated airplane such as the Bonanza. Corporation's patients were not spread out over a large territory. There is no evidence that any of Corporation's patients were located outside the Santa Cruz area. There is no evidence that Drs. Anzalone and Blanton practiced medicine at any of the places to which they flew in the Bonanza. Their medical practice was limited to the Santa Cruz area. Moreover, *244 petitioners have not proved that it was "helpful" to Corporation to own and operate an airplane. Corporation had no pressing business need to have an airplane available to it at all times. Compare Palo Alto Town and Country Village, Inc. v. Commissioner,565 F. 2d 1388 (9th Cir. 1977), revg. a Memorandum Opinion of this Court. The doctors traveled to only two medical meetings in the two years in issue in Corporation's airplane. Petitioners have not shown that the few individuals entertained produced any substantial portion of Corporation's referral business, that the referrals by these individuals increased in any meaningful way because they had been flown somewhere by private plane, or that profits resulting from such referrals were, or could reasonably have been expected to be, commensurate with the airplane expenses. Finally, it is hardly appropriate normally to hold conferences with one's lawyer or CPA in the noisy interior of a private plane or in some city distant from both Corporation's business and the lawyer's and CPA's offices. The choice of setting smacks more of the pursuit of a hobby than of an appropriate business undertaking. Therefore we conclude *245 that owning and operating the airplane was not a "necessary" business expense of Corporation. We also find it was not an "ordinary" business expense. Instead of being a normal and natural response under the circumstances, it was highly unusual for a medical corporation with its business limited to a single city and the immediate surrounding area to purchase an airplane. Moreover, we noted above that the doctors left the Santa Cruz area only twice in the two fiscal years in issue to attend medical meetings by private airplane. Certainly it is unusual to use a private airplane to hold conferences with one's lawyer or CPA when the area flown to has no connection with the business under discussion. Dr. Blanton was discussing malpractice insurance with the lawyer and Corporation's pension and profit sharing plans with the CPA. The individuals who referred business to Corporation could easily and far more economically have been entertained in Santa Cruz or flown to the vacation spots in question either by commercial flights or, if it were deemed desirable to use private transport, by rental of an airplane at an hourly rate. While the law does not impose upon the businessman the duty *246 of entertaining in the cheapest possible manner, the choice of highly expensive modes of achieving an alleged business objective is relevant when the issue is whether business or personal motives were involved. The Treasury need not subsidize an expensive hobby merely because it is put to occasional business use.Certainly it was not the usual response, but a highly unusual one, to entertain doctors who made merely occasional referrals by taking them out of town by private plane. There is no showing that Corporation realistically anticipated that profits from such referrals would repay the cost of such entertainment or indeed that they ever did. So we do not find the owning and operating of the airplane to be an "ordinary" business expense of a medical corporation like the petitioner in this case. In addition, we find that the amount of the expense ($29,582 in the two fiscal years in issue) was unreasonable in amount compared to the objectives to be accomplished. The doctors could have rented a similar airplane for $25 an hour during the years in issue. It was not necessary for Corporation to own its own airplane for the doctors to be able to fly to medical meetings--it was extravagant *247 to do so. The same is true for entertaining the few airline pilots and referring doctors who were flown to resorts by Drs. Anzalone and Blanton during the period in issue. And the airplane in flight was certainly an unreasonably expensive place to hold a business conference considering that the Corporation and the lawyer, CPA, and other doctors all presumably had offices available for such purposes. Finally, and most damaging to petitioners, we conclude that the real reason Corporation purchased the airplane was for the personal pleasure of Drs. Anazalone and Blanton, and not for business reasons. We find no good reason for such a business expenditure, as noted above. On the other hand, both Drs. Anzalone and Blanton ejoyed flying. They spent many hours a year doing just that for practice, for pleasure and allegedly for business. They were so fond of flying that prior to Corporation's purchase of the Bonanza they had personally purchased a Cherokee which they continued to own and fly for pleasure during the years in issue. For all these reasons we conclude that the costs of Corporation's purchase and operation of the Bonanza were not reasonable, ordinary and necessary business *248 expenses. Nonetheless, Corporation is entitled to deduct a reasonable amount for transportation by the doctors to the two medical meetings. These trips were ordinary and necessary in the course of Corporation's business. It may well be that it was more convenient for the doctors to travel by private airplane and in any event the choice of mode of transport is up to the taxpayer. The tax law does not impose a duty to take the cheapest mode of transport. Therefore, Corporation is entitled to deduct $25 per hour, the fair rental expense during the yeras in issue of a similarly equipped Bonanza, for the time expended flying to the two medical meetings. [4] Sec. 1.274-2(b)(1)(iii)(c)(1), Income Tax Regs. As to the trips taken to entertain referring doctors, petitioners have not carried their burden of proof that the anticipated level of profits from referrals from *249 these doctors sufficed to justify the implicit cost of flying them places for their entertainment, and we are not convinced that Drs. Anzalone's and Blanton's motives were not predominantly personal. Moreover, even if the trips with referring doctors were deemed business trips within the meaning of section 162, petitioners have not met their burden of proof under section 274(a)(1)(B) that the airplane "was used primarily for the furtherance of the taxpayer's trade or business * * *." Three airplane trips remain to be examined. Two of them were to look at condominiums which Corporation might at some time be interested in buying as an investment. So far as the evidence shows, Corporation has never made such an investment. We are not convinced that the generalized looking around at condominiums in resort areas is sufficiently related to Corporation's business to be a business expense. The third trip was to look at an investment the doctors owned in their individual names. Obviously this trip was not a business expense of Corporation. Since we have held that the costs of purchase and operation of the airplane were not deductible business expenses of Corporation, the accompanying *250 expenses of training the doctors as pilots, kweping up their flying proficiency, and maintaining and repairing the airplane were likewise not business expenses. Because we do not find the expenses of the airplane to be deductible business expenses of Corporation, we need not reach the further question whether those expenses were properly substantiated under section 274. Likewise, and therefore not depreciable by Corporation under section 167, Corporation is not entitled to an investment credit for the airplane. Finally, since the costs of ownership and operation of the airplane were not ordinary and necessary expenses to Corporation, all flights taken by Drs. Anzalone and Blanton (except the two to medical meetings) were personal flights. Under the circumstances they should have reported as dividends on their individual income tax returns the fair rental value (determined to be $25 an hour) of the Corporation's airplane used by them for such personal reasons. Ashby v. Commissioner,50 T.C. 409 (1968); Challenge Mfg. Co. v. Commissioner,37 T.C. 650 (1962). Decision will be entered under Rule 155.
Footnotes
1. The following cases were consolidated herewith for purposes of trial, briefing and opinion: John Blanton and Elizabeth Blanton, Docket No. 3675-77, and Joseph Anzalone and Lavonne Anzalone, Docket No. 3676-77.↩
2. All destinations are within California unless otherwise noted.↩
3. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
4. Dr. Blanton's trip to Los Angeles for a convention was "away from home" within the meaning of section 274 but we conclude that Corporation has adequately substantiated the time, place, business purpose and amount incurred on this trip for purposes of section 1.274-5, Income Tax Regs.↩